IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SARAH H. HARKLESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | 2:12-CV-238-MEF-TFM |
| MENTAL HEALTH, AND | ) | |
| DR. TAMMY PEACOCK, in her | ) | |
| individual capacity, | ) | JURY DEMAND |
| | ) | |
| Defendants | ) | |

## COMPLAINT

### I.   INTRODUCTION

1.    This is an action for legal and equitable relief to redress race discrimination, racial harassment, and retaliation based on the race and unlawful retaliation against the Plaintiff.  The suit is brought to secure the protection of and to redress the deprivation of rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981a (hereinafter "Title VII"); 42 U.S.C. § 1981 (hereinafter "§ 1981"), which provide for relief against discrimination in employment.  Plaintiff also sues Dr. Tammy Peacock individually for violating Plaintiff's Fourteenth Amendment Equal Protection rights. The plaintiff seeks compensatory and punitive damages, and requests a jury trial pursuant to 42 U.S.C. § 1981a.

2.    A substantial part of the unlawful employment practices challenged in this action occurred in Montgomery County, Alabama.  Venue is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5.

### II.   JURISDICTION

3.     Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4), and 42 U.S.C. § 2000e-5.

III.    **ADMINISTRATIVE PREREQUISITES**

4.     The Plaintiff has met all administrative conditions precedent for the filing of this case under Title VII.

IV.    **PARTIES**

5.     Plaintiff, Sarah H. Harkless ("Harkless"), is an African-American female citizen of the United States over the age of nineteen (19) years and is a resident citizen of the State of Alabama.

6.     Defendant, Alabama Department of Mental Health (the State of Alabama), (hereinafter the "ADMH") is an employer for the purposes of Title VII.

7.     Defendant, Dr. Tammy Peacock (a Caucasian) (hereinafter "Peacock") is the Associate Commissioner for the Mental Health and Substance Abuse Services Division of the Alabama Department of Mental Health and is sued in her individual capacity pursuant to 42 U.S.C. §1981 through 42 U.S.C. § 1981; and the Fourteenth Amendment to the United States Constitution.

V.     **STATEMENT OF FACTS AND CLAIMS**

8.     The Plaintiff realleges and incorporates by reference paragraphs 1-8 above with the same force and effect as if fully set out in specific detail hereinbelow.

9.     The Alabama Department of Mental Health is a State of Alabama Agency.

10.     Plaintiff, Sarah H. Harkless, is a 60 year-old African-American female.

11.     Plaintiff began her employment with the above named employer on April 1, 2003, classified as a Mental Health Specialist IV with a working job title of Executive Assistant.

12.     Plaintiff has always performed her duties in an exemplary manner.

2

13.     On March 1, 2007, Plaintiff's position was reclassified as a Mental Health Specialist V with a working job title of Director of Substance Abuse Community Programs.

14.     On January 19, 2011, Dr. Tammy Peacock (White), was appointed as the Associate Commissioner for Substance Abuse Services, and on this same date Dr. Peacock informed Plaintiff that she would no longer supervise any employees within the Division.

15.     This reduction in responsibility and prestige was done without concern or evaluation of Harkless' performance.

14.     No White Director had their subordinates whom they supervised taken away from them by Dr. Peacock, as did Plaintiff.

15.     At the same time, Dr. Peacock also informed Plaintiff she was removing development of the substance abuse services standards from under Plaintiff's direction, and giving them to a committee for completion. This was a project that Plaintiff had spearheaded for almost three years.

16.     Dr. Peacock also stated she was considering ending two other projects which were under Plaintiff's supervision and direction.

17.     On January 20, 2011, Dr. Peacock informed the staff through a revised organizational chart that Plaintiff would no longer be supervising anyone.

18.     Prior to this announcement, Plaintiff was responsible for supervising four (4) people, the Directors of Treatment, Prevention, and Certification/Training and an Administrative Support Assistant III.

19.     Dr. Peacock assumed supervisory responsibility for the directors formerly under Plaintiff's supervision, and all leave slips and travel authorizations for these individuals were signed by Dr. Peacock beginning January 19, 2011. The Administrative Support Assistant III who had been

3

supervised by Plaintiff was initially assigned to Dr. Peacock's Administrative Assistant for supervision and later to another senior employee.

20.     Dr. Peacock also distributed this same organizational chart at the February 2011 Substance Abuse Coordinating Subcommittee Meeting.

21.     On February 7, 2011, Dr. Peacock informed Plaintiff that she was to discontinue work on the Standards for the Substance Abuse Services Division.

22.     This was a project Plaintiff initiated and spearheaded, and it was very close to completion after nearly three years of work.

23.     After making several deletions from the draft Standards document, including the entire section on cultural competency, Dr. Peacock assigned the task of completing the standards to an all White committee of providers.

24.     On February 8, 2011, Dr. Peacock informed Plaintiff that she was not to express any ideas in meetings without prior discussion with Peacock.

25.     In addition, Dr. Peacock after becoming Harkless' supervisor, would fail to notify Plaintiff of meetings that should have included Harkless.

26.     When questioned by Harkless about Peacock's failure to include her, Peacock would say she "forgot to include Harkless."

27.     Peacock did not fail to include white workers in these meetings.

28.     Dr. Peacock did not at the beginning of her tenure, or at any time later, strip the white supervisors of their staff and duties like she did Plaintiff.

4

29.   Dr. Peacock also informed Plaintiff that she was replacing her with Robert Wynn (White), on the Substance Abuse Coordinating Subcommittee, and that Plaintiff was not liked by community providers.

30.   Plaintiff explained to Dr. Peacock that any negative reports she (Peacock) had received about Harkless were a reflection of resistance to change, as well as racially motivated.

31.   Dr. Peacock's only response was "I understand White privilege."

32.   On February 17, 2011, Plaintiff asked Dr. Peacock about her plans for Harkless' position.

33.   Dr. Peacock stated "I don't know yet. That's what I'm still trying to figure out. That's why I have you on such a short leash."

34.   On March 14, 2011, an announcement was made that the Substance Abuse and Mental Illness Divisions would be combined and Dr. Peacock would be the Associate Commissioner for the merged divisions.

35.   Plaintiff went to Dr. Peacock and offered her assistance with the systems integration.

36.   Dr. Peacock acknowledged Plaintiff's offer, but completely excluded her in this effort.

37.   On March 21, 2011, Dr. Peacock sent an email welcoming Cyrilla Beveridge (White and much less qualified than Plaintiff) as the new Director of Community Programs.

38.   As of March 21, 2011, Plaintiff's job title was Director of Substance Abuse Community Programs.

39.   Since the Mental Illness and Substance Divisions merged, Plaintiff was in line to become Community Programs Director for the merged divisions.

5

40.     Dr. Peacock included Ms. Beveridge in all planning and leadership activities from which Plaintiff was excluded.

41.     On April 13, 2011, Mr. Wynn, who was at one time under Plaintiff's supervision, came to her office and said he had a doll for her.

42.     The doll was a black-faced Aunt Jemima doll.

43.     Wynn said it reminded him of Plaintiff.

44.     On May 3, 2011, Plaintiff received an email from Lynn Frost, Administrative Assistant for Dr. Peacock which advised Plaintiff that her new job title was Director of Development for Substance Abuse Services. No description of the Director of Development's duties and responsibilities accompanied this email or was otherwise provided to the Plaintiff until nearly two months later.

45.     On May 6, 2011, Dr. Peacock distributed a system-wide e-mail to all ADMH staff, providers, and other stakeholders in which she announced that the Plaintiff's new job title was Director of Development for Substance Abuse Services, and that "she will be spearheading special initiatives for the Division as assisting with preparations for health care reform."

46.     In this same e-mail, Dr. Peacock announced that Robert Wynn "will address all programmatic issues related to substance abuse community programs."

47.     All programmatic issues related to the substance abuse community programs had been under the direction of the Plaintiff since March 1, 2007.

48.     On May 6, 2011, Plaintiff was issued a written warning by Dr. Peacock.

49.     The warning apparently resulted from actions Plaintiff took to help a White employee meet a deadline that had been assigned by Dr. Peacock.

6

50.    The White employee, Ms. Beveridge, was not disciplined, nor was Kathy Seifried, White, Executive Assistant who sent Ms. Beveridge to Plaintiff for assistance.

51.    Dr. Peacock has consistently established substance abuse provider committees and task groups to assist the Division in various capacities that consist of all white members. When Dr. Peacock has added a Black person to one of these groups, it has always been the same Black male who goes from one committee to another.

52.    This individual is a "yes man" who does not express independent ideas but provides a Black countenance at the meetings.

53.    This man has been the only Black on the Substance Abuse Coordinating Subcommittee since Dr. Peacock replaced the Plaintiff with Robert Wynn (White). This Committee serves as the Division's primary planning and advisory body.

54.    On May 6, 2011, Plaintiff went to the office of Kimberly Boswell, Director of the Alabama Department of Mental Health's (ADMH) Personnel Office, and orally reported that she had been subjected to a hostile work environment and discriminatory treatment by her supervisor, Dr. Tammy Peacock.

55.    On May 9, 2011, Plaintiff submitted a written report of her complaints to Ms. Boswell.

56.    On May 9, 2011, the same day Plaintiff submitted the written racially hostile work environment and race discrimination complaint to ADMH's personnel office, Kimberly Boswell (White) amended Plaintiff's most recent performance appraisal but did not show it to Harkless or review it with Harkless.

7

57.     This appraisal had been completed by Plaintiff's former supervisor, Mr. J. Kent Hunt, on January 14, 2011.

58.     Ms. Boswell attached derogatory comments to the appraisal and submitted both the appraisal and comments to the Alabama State Personnel Office to be placed in Harkless' official personnel file.

59.     At the same time, commendations that had been attached to Plaintiff's performance appraisal by Mr. Hunt were not submitted to the State Personnel Office or filed in Plaintiff's ADMH personnel record.

60.     Plaintiff had no idea that any negative comments existed in her personnel records, and learned of such only when she went to the State Personnel Office on December 1, 2011, to verify the date that she became the Director of Substance Abuse Community Programs.

61.     To date, the ADMH personnel office has not provided Plaintiff with a copy of her January 14, 2011 appraisal, or any amendments that had been made to such.

62.     A memorandum dated May 10, 2011, the day after Plaintiff submitted the hostile work environment complaint to ADMH's personnel office, addressed to Stephanie McCladdie from Dr. Peacock, stated that Plaintiff was no longer Ms. McCladdie's supervisor due to merger of the two divisions.

63.     The memorandum stated that as of April 15, 2011, Dr. Peacock was Ms. McCladdie's new supervisor.

64.     The document was signed by Dr. Peacock on May 24, 2011, the day after Plaintiff met with the individual assigned to investigate her hostile work environment complaint, Ms. Jackie Sexson.

8

65.     It is Plaintiff's understanding that Dr. Peacock met with Ms. Sexson on that same day and the memorandum was created for the purpose of that investigation.

66.     This memorandum contained completely false information and Plaintiff believes was created after her complaint as an attempt to cover discriminatory actions taken towards her by Dr. Peacock.

67.     Dr. Tammy Peacock forwarded an email Plaintiff had sent to her on May 13, 2011, to the ADMH personnel office.

68.     In this email, Plaintiff revealed that she has a disability, Attention Deficit Disorder, and additionally listed mechanisms she had used to cope with this disorder.

69.     These mechanisms included working at home from time to time, as had been authorized by her supervisor, to minimize distractions.

70.     Dr. Peacock did not discuss this matter with Plaintiff or in any way inform her she was sending this email to the ADMH personnel office.

71.     This action was, thus, taken without Plaintiff's knowledge or consent.

72.     As a result, Dr. Peacock and Kimberly Boswell wrote a letter which stated that Plaintiff had requested ADA accommodations, and sent a letter to her as though they were responding to a request made by Plaintiff.

73.     Plaintiff was quite surprised to receive the letter and immediately went to the ADMH personnel office and informed Ms. Boswell that she had not made a request for ADA accommodations.

74.    Boswell stated that Dr. Peacock had informed her of Plaintiff's request to take an annual leave day to work at home, and that since she had made this request in relation to a disability, she had essentially requested accommodations.

75.    As a result of this request, Ms. Boswell stated Plaintiff was now required to formally request ADA accommodations.

76.    Although Plaintiff fully complied with this request, ADMH personnel denied receipt of medical records from Plaintiff's doctor which verified her disability, when in fact, this information had been received.

77.    After finally acknowledging that Plaintiff's medical records had been received, Plaintiff was then told that her request for accommodations had to be reviewed by a committee of her co-workers because that was the policy of ADMH policy.

78.    On August 9, 2011, when Plaintiff voiced concerns to Mrs. Boswell about violation of her rights to privacy by presenting her protected health information to a committee made up of her co-workers, Boswell told Plaintiff that she was focusing on the wrong thing.

79.    Boswell told Plaintiff that she should be focusing on compliance with ADMH's policy.

80.    On August 10, 2011, Plaintiff sent Mrs. Boswell an email in which she stated that if the ADMH personnel office should proceed with presentation of her health information to this committee, it would be without her permission.

81.    Boswell was further informed that since it had been indicated that Plaintiff had requested accommodations, she was now withdrawing that request.

10

82.     Boswell did not respond to this email and no further information has been provided to Plaintiff in regard to ADA accommodations.

83.     On May 31, 2011, Plaintiff called into the office prior to Dr. Peacock's arrival at work, and asked the secretary to inform Dr. Peacock that she was sick and would not be coming in that day.

84.     Plaintiff had just completed a grant application which had been an exhausting task.

85.     The grant application was Plaintiff's first such effort without any supporting staff assistance, in conjunction with the stress she was experiencing as a result of the discriminatory treatment to which she had been constantly subjected, had left Harkless completely exhausted.

86.     Plaintiff called Dr. Peacock on the next morning, June 1, 2011, and told her she was still not well and planned to take the remainder of the week off.

87.     Still not better, Plaintiff went to see one doctor on June 2, 2011, and another on June 3, 2011.

88.     When Plaintiff returned to work on June 6, 2011, she completed a leave slip for the time she had taken off the previous week.

89.     On the leave slip, Plaintiff reported the use of compensatory time, of which she had accumulated, for the four days of which she was off.

90.     Plaintiff was informed by Dr. Peacock's Administrative Assistant, Lynn Frost, on or around June 16, 2011, that she could not use my accumulated compensatory time for the leave she had taken.

91.     Dr. Peacock's Administrative Assistant informed Plaintiff that Dr. Peacock stated the Plaintiff had to use "sick leave."

1

92.     The use of compensatory time for sick leave, vacation leave, and other purposes had been at the employee's discretion in the past so long as the time off did not interfere with work responsibilities.

93.     On June 22, 2011, Plaintiff received an email from Ms. Boswell in the ADMH personnel office stating that she needed to have her health care provider complete paperwork for her time off to establish if the leave qualified as leave under the FMLA.

94.     Plaintiff complied with this requirement.

95.     Plaintiff was subsequently granted FMLA leave based upon what her doctor diagnosed as situational stress associated with a hostile work environment.

96.     Plaintiff continued to see a counselor at least once per month for this condition.

97.     During June, July, and August 2011, Dr. Peacock sent Plaintiff numerous emails in which she challenged her integrity, accused her of doing things she had not done, did not allow Plaintiff to complete tasks which she was assigned by Dr. Peacock, altered task assignments she had previously approved, and/or simply seemed to have harassment as the email's intent.

98.     Dr. Peacock sent copies of many of these emails, which contained information relative to her job performance and should not have been shared with others, to Kathy Seifried and/or Lynn Frost.

99.     Dr. Peacock has not, to date, responded to any of the rebuttals in which Plaintiff sent in response to accusations or claims she made in these emails.

100.    Plaintiff copied the ADMH Personnel Office Director, Kimberly Boswell, on many of her rebuttals to Dr. Peacock, but has not received any assistance nor a response.

101.    From June 2011 through the present time, Dr. Peacock has continued to omit Plaintiff

2

as an attendee at Medicaid related meetings that provide information which she needs in order to successfully perform job responsibilities assigned to her by Dr. Peacock.

102.    Plaintiff has submitted a written request to Dr. Peacock to attend all Medicaid meetings.

103.    Dr. Peacock denied Plaintiff's request.

104.    After the meetings from which Plaintiff is excluded, Plaintiff receives no reports from the attendees other than general announcements made at general staff meetings, although it is still Plaintiff's responsibility to complete the related job tasks regarding these Medicaid meetings.

105.    Kathy Seifried attends each of these meetings, has no Medicaid related experience, and has not made any contributions to the Medicaid related work that has taken place in the ADMH office, neither before nor after Dr. Peacock's arrival.

106.    Dr. Peacock did not meet with Plaintiff to discuss Harkless' job description until June 24, 2011.

107.    Plaintiff did not receive the full details of her new job responsibilities as Director of Development for Substance Abuse Services until July 5, 2011, when she received a copy of her Form 40 from Dr. Peacock's Administrative Assistant.

108.    When Plaintiff did receive the job description, it reflected a job with much less responsibility and prestige than she had been doing or her job classification could do.

109.    Further, Peacock continued to leave Plaintiff out of meetings, making it difficult for her to do her new job and isolating her from the other members of the team.

110.    On August 19, 2011, Dr. Peacock called Plaintiff into her office and presented her with a written reprimand.

3

111.   This level of disciplinary action requires an automatic deduction of seven (7) points from an employee's annual performance appraisal.

112.   In addition to lowering her performance appraisal score, Dr. Peacock relieved Plaintiff of her responsibilities as the state's Women's Services Coordinator, and indicated she was replacing Plaintiff with someone else.

113.   This retaliatory move by Dr. Peacock also caused Plaintiff to lose her membership with the Women's Services Network, as well as, the chairmanship of the Pregnancy and Parenting Committee of the National Association of State Alcohol and Drug Abuse Directors.

113.   Dr. Peacock has not yet named a women's services coordinator.

114.   If a plan of action was submitted to the federal project officer in regard to women's services as Dr. Peacock specified in the Written Reprimand, there are no signs of its implementation.

115.   Without formally announcing such, as is routinely the case, Bob Wynn and Dr. Peacock authorized action by one of the state's women's treatment providers to close thirteen (13) residential treatment beds for women.

116.   This action was taken although the state planning process has consistently identified a shortage of treatment beds for women.

117.   Plaintiff stated to Dr. Peacock and documented on the written reprimand that she believed her actions to be retaliation for her filing the hostile work environment complaint.

118.   Dr. Peacock ignored Plaintiff's comment.

119.   Dr. Peacock also ignored Plaintiff's September 1, 2011, written rebuttal of the charges outlined in the written reprimand, in which she stated she believed the actions Dr. Peacock was taking were based upon her race.

4

120.    Plaintiff also sent a copy of the written rebuttal to Kimberly Boswell.

121.    The written reprimand has been filed in Plaintiff's ADMH personnel record.

122.    Plaintiff's written rebuttal has not been filed in her personnel record and there has been no response from the personnel office in regard to such.

123.    On August 22, 2011, Plaintiff went to the ADMH personnel office to seek an appeal of the written reprimand she had received from Dr. Peacock on August 19, 2011.

124.    Plaintiff met with Kimberly Boswell and gave her a copy of the reprimand to read which included the written comments she had added about retaliation.

125.    Boswell stated that there was nothing that she could do for Plaintiff.

126.    Boswell stated that despite Plaintiff's claims of retaliation there was no action she could take because Plaintiff had already filed one racially hostile work environment complaint.

127.    Boswell also stated that Plaintiff had a pending EEOC complaint and that EEOC had requested that ADMH preserve her records.

128.    Plaintiff asked Ms. Boswell the date of this notification from EEOC and she stated it was August 1, 2011.

129.    Boswell asked Plaintiff if she had an attorney or if she was trying to handle the EEOC complaint alone.

130.    Plaintiff told Boswell that she did have an attorney.

131.    She suggested that Plaintiff contact her attorney for assistance because there was nothing she could do to help.

132.    The position of the agency is discriminatory and retaliates because there is no provision in the policies which says she loses her rights for an internal investigation because she has

5

filed an EEOC charge.

133.    On October 24, 2011, Dr. Peacock came into Plaintiff's office and told her she would like for her to work exclusively with the women's programs and perform no other duties, and that she could think about it and let her know.

134.    Dr. Peacock asked Plaintiff the next day if she had thought about it, to which Harkless replied that she had several questions that she would like to ask.

135.    Plaintiff scheduled a meeting with Dr. Peacock to discuss this matter and on October 27, 2011, sent her a list of questions and concerns for discussion during the meeting, which was to be held on October 28, 2011.

136.    Dr. Peacock cancelled the meeting one-half hour before it was scheduled to take place on October 28 at 1:00 PM, and has not discussed this matter with Plaintiff since that date.

137.    The written reprimand Dr. Peacock gave Plaintiff on August 19, 2011, removed all of Plaintiff's responsibilities for women's services.

138.    Dr. Peacock's request for Plaintiff to work exclusively with the women's services was ironic in that she had recently reprimanded her harshly for what she stated was unacceptable job performance in this area.

139.    Dr. Peacock's offer represented what Plaintiff perceived was another effort to downgrade her position.

140.    The job classification of positions in the Mental Health/Substance Abuse Services Division that would be equivalent to that of a women's services coordinator include those of the adolescent services coordinator and the co-occurring services coordinator.

141.    These jobs are classified as a Mental Health Specialist III.

6

142.     Plaintiff's current job classification is that of a Mental Health Specialist V.

143.     In Plaintiff's October 27, 2011, email to Dr. Peacock, she reminded her that women's services had not been a priority of her administration.

144.     Plaintiff also voiced her belief that the needs for the position she held when Dr. Peacock arrived still existed.

145.     On December 7, 2011, Plaintiff went to the ADMH personnel office and asked the ADMH Personnel Director to view her personnel record.

146.     Upon doing so, Plaintiff found derogatory remarks in her personnel record which is on file at ADMH's personnel office.

147.     These remarks which were written under the signature of former ADMH Commissioner John Houston on January 14, 2011, addressed Plaintiff's Mid-Appraisal.

148.     However, Plaintiff did not have a Mid-Appraisal on January 14, 2011.

149.     Plaintiff had not received a copy of this document, prior to December 1, 2011 and had no idea that Mr. Houston had written any derogatory comments about her job performance.

150.     In addition, Plaintiff has no idea of the circumstances which provide the foundation of his comments.

151.     No one has, to date, discussed this matter with Plaintiff and she has not received a copy of Commissioner Houston's comments from the ADMH personnel office.

152.     It is very puzzling (1) that Commissioner Houston would write such a statement; (2) why he would write such a statement when he had never before, during his term as ADMH Commissioner, written any comments on any of Plaintiff's performance appraisals; and (3) why he would write such a statement on what was most likely his last work day as ADMH Commissioner.

7

153.    On January 11, 2012, Kathy Seifried informed Plaintiff that she had been appointed by Dr. Peacock to serve on the Alabama Commission for Women and Girls in the Criminal Justice System, created by the Alabama State Legislature.

154.    Prior to this change by Dr. Peacock, Plaintiff represented the Substance Abuse Services Division on this Commission.

155.    Plaintiff believes she is being discriminated against because of her race and being retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

156.    Plaintiff also believes she has been subjected to racial harassment.

## COUNT I – CLAIMS OF RACE DISCRIMINATION
## AGAINST THE ALABAMA DEPARTMENT OF MENTAL HEALTH
## IN VIOLATION OF TITLE VII

157.    The plaintiff realleges and incorporates by reference paragraphs 1-156 above with the same force and effect as if fully set out in specific detail hereinbelow.

158.    Plaintiff has been discriminated against on the basis of her race in violation of Title VII in pay, job and work assignments, discipline, evaluations, transfers and in all other terms and conditions including a hostile environment because of racial harassment by her employer, the Alabama Department of Mental Health.

## COUNT II – CLAIMS OF RETALIATION FOR OPPOSING
## DISCRIMINATION BY FILING AN INTERNAL COMPLAINT
## WITH THE ALABAMA DEPARTMENT OF MENTAL HEALTH AND THE EEOC

159.    The plaintiff realleges and incorporates by reference paragraphs 1-158 above with the same force and effect as if fully set out in specific detail hereinbelow.

160.    As discussed above, Plaintiff was retaliated against for opposing discrimination by

8

making a complaint with the Alabama Department of Mental Health and for filing an EEOC charge in the area of discipline, jobs and work assignments, transfers, and all other terms or conditions.

## COUNT III – CLAIMS OF RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1981 (ASSERTED VIA 42 U.S.C. § 1983) AGAINST DR. TAMMY PEACOCK

161.    The plaintiff realleges and incorporates by reference paragraphs 1-160 above with the same force and effect as if fully set out in specific detail hereinbelow.

162.    As discussed above, Defendant Peacock has violated 42 U.S.C. § 1981 (asserted via 42 U.S.C. § 1983) and the Fourteenth Amendment by denying Plaintiff equal protection under the law in her employment because of her race.

## VI.    PRAYER FOR RELIEF

**WHEREFORE,** the plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1.    Grant the plaintiff a permanent injunction enjoining the defendants, their agents, successors, employees, attorneys and those acting in concert with the defendants and at the defendants' request from continuing to violate Title VII and as to Peacock as an individual for violating 42 U.S.C. § 1981 and denying Plaintiff of her Fourteenth Amendment rights.

2.    Grant the plaintiff an order requiring the defendant to make her whole by awarding her instatement into the position she would have occupied in the absence of retaliation, and/or race discrimination by the defendants with the same seniority, leave and other benefits (or front pay), and back pay (with interest), and by awarding plaintiff compensatory damages for emotional distress and nominal damages.

9

3.    The plaintiff further prays for such other relief and benefits as the cause of justice

may require, including, but not limited to, an award of costs, attorneys' fees and expenses.

Respectfully submitted,

_____

Ann C. Robertson - ASB-7007-n76a
H. Wallace Blizzard - ASB-8969-b59h
Counsel for Plaintiff

OF COUNSEL:
WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL ISSUES TRIABLE BY A JURY.**

_____

OF COUNSEL

**Plaintiff requests this Honorable Court to serve via certified mail upon the Defendants the following: Summons, Complaint.**

**Defendants' Address:**
**Alabama Department of Mental Health**
**100 North Union Street**
**Post Office Box 301410**
**Montgomery, AL 36130-1410**

20

Dr. Tammy Peacock
**Alabama Department of Mental Health**
**Division of Mental Health & Substance Abuse Services**
**100 North Union Street**
**Post Office Box 301410**
**Montgomery, AL 36130-1410**

OF COUNSEL